IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Louvenia Carter,<br><br>　　　　　　　　　Plaintiff,<br><br>vs.<br><br>Centura College,<br><br>　　　　　　　　　Defendants. | Civil Action No. 2:10-907-CWH-BHH<br><br>**REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE** |

This matter is before the Court on the defendant's motion for summary judgment [Doc. 26] pursuant to Federal Rule of Civil Procedure 56 to dismiss all claims of the plaintiff.[1] The plaintiff has pled two claims for religious discrimination and retaliation, pursuant to Title VII of the Civil Rights Act.[2]

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTUAL BACKGROUND**

The plaintiff Louvenia Carter worked for Defendant Centura College between March 5, 2005, and her resignation on May 31, 2008. (Compl. ¶¶ 17 and 43.) In or around June

---

[1] The defendant has liberally construed the Complaint of the plaintiff and has addressed theories of liability, to wit, hostile work environment, which the plaintiff, herself, has not acknowledged as either a part of the original Complaint or in the way summary judgment has been argued. There is only a failure to accommodate claim and a retaliation claim. Although, it appears that the latter has been abandoned. *See infra* n.2.

[2] The plaintiff has made no response to the defendant's arguments that her retaliation claim should be dismissed. The Court, therefore, considers the claim abandoned. The Court has also reviewed the argument of the defendant in this respect and, in the absence of any evidentiary rejoinder of the plaintiff, in keeping with her obligations under Federal Rule of Civil Procedure 56, the Court would only be able to recommend dismissal of the same.

of 2005, the defendant promoted the plaintiff to be a coordinator over its Legal Assistant program. (Pl. Dep. at 19-23.)

In or around August of 2007, the defendant gave the plaintiff additional duties as the coordinator of the General Education program. As a Coordinator of the two departments, it was plaintiff's job to manage the entire department. (Pl. Dep. at 27.) In the plaintiff's Coordinator positions she worked from 8:00 a.m. to 5:00 p.m. Monday, Tuesday, Thursday and Friday. (Pl. Dep. at 31.) On Wednesdays plaintiff had a late day where she would work from 10:00 a.m. to 7:00 p.m. *Id.* At no time from June 2005 to January 2008 was plaintiff required to work or teach classes at night. *Id.* at 25.

At the same time, it is undisputed that the plaintiff is an Assistant Pastor and Youth Pastor at the Open Door Apostolic Church Number One of Jesus Christ. The church has two locations – one in North Charleston and one in Greeleyville, South Carolina. As an Assistant Pastor and Youth Pastor, plaintiff presides over services at the two churches on Tuesday and Thursday nights. (Pl. Aff. ¶ 3.) Based upon the plaintiff's work schedule from 2005 until January of 2008, plaintiff never had a conflict between her work hours and her religious activities.

In February or early March, the plaintiff was informed that she would need to begin teaching a split shift with afternoons off and classes at night. (Compl. ¶ 24; Pl. Dep. at 47.) The defendant alleges that it has a corporate policy applicable to all of its schools in several states that Coordinators are "required to teach minimum classes if their student counts at the beginning of the module (a five-week teaching section from Monday through Thursday) drop below 100 students; less than 50 students, teach four classes per week; 50-100 students, teach two classes per week; over 100 students, first line of substitution." (Pl. Dep. at 42; Def. Ex. 3; Thompson Dep. at 41-43, 58.) The defendant contends that the policy

was necessary to control costs. (Riggs Dep. at 17-18; Varner Dep. at 87-88.)  As a result, Coordinators, like the plaintiff, were asked to cover evening classes.

The defendant allegedly required Coordinators to teach evening classes for several reasons:  to meet and know all Coordinators (Riggs Dep. at 73-74); for Coordinators to learn more about the night students, with an eye to serving their needs and increasing retention of students; and (3) to use salaried Coordinators as evening teachers in order cover all classes without adding the cost of hiring additional instructors (Varner Dep. at 38, 45).

The plaintiff advised the defendant that this requirement posed a conflict with her Tuesday and Thursday pastoring obligations. (Riggs Dep. 83-84; Pl. Dep. 32, 58-61.) The plaintiff estimates that all in all, she requested a religious accommodation for Tuesday and Thursday nights from School Director David Riggs three or four times and from her immediate supervisor, Katrina Varner, three or four times.  It is not disputed that the accommodation was never granted. (Pl. Dep. at 149; Riggs Dep. at 84-85, 87.)

The defendant subsequently scheduled the plaintiff to work nights on Tuesdays and Thursdays, which resulted in the plaintiff missing her religious activities on those nights. (Pl. Dep. at 102, 115.)   The plaintiff was scheduled to work nights on Tuesdays and Thursdays for March, April and May. (Pl. Dep. at 44-45, 54-55, 64-67.)

On or about May 31, 2008, the plaintiff resigned from the defendant due to its refusal to accommodate her requests. (Pl. Dep. at 119).  The plaintiff started a new job at J.K. Harris on June 2, 2008, which apparently pays better than her work with the defendant.[3] (Pl. Dep. at 125.)

---

[3]  While there is some limited discussion of the plaintiff's damages, or lack thereof, the defendant has not actually moved for summary judgment based on any failing of that element of her claim.

## **APPLICABLE LAW**

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to

preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I.   Religious Discrimination - *Failure to Accommodate*

The plaintiff contends that the defendant discriminated against her on account of her religious beliefs by requiring her to teach nighttime classes, in conflict with her religious activities as a pastor at her church.

A Title VII plaintiff establishes a *prima facie* case of religious discrimination by showing that (1) she had a bona fide religious belief that conflicted with her employment requirements; (2) she advised her employer of those beliefs; and (3) she was disciplined for failing to comply with the conflicting employment requirement or that some other adverse employment action was taken. *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1019 (4th Cir. 1996). Once the plaintiff has established a *prima facie* case, the employer must prove either that it offered a reasonable accommodation to resolve the conflict between the plaintiff's beliefs and the employer's requirements or that the employer could not do so without suffering an undue hardship. *Id.*

#### A.   *Prima Facie* Case

##### 1.   Bona fide religious belief

The defendant has not put the point directly in play, but, as an initial matter, the Court would at least rhetorically question whether the facts of this case can even be said to implicate a "bona fide religious belief." Seeing as the plaintiff is an associate pastor, the question portends of waste and, its answer, obviousness. But, in its consideration of the motion, the Court was increasingly mindful of a sense that the conflict seemed to be of an

occupational rather than a religious kind. As will be discussed, the Court declines to resolve it precisely because the matter has not actually been challenged. Of course, Title VII defines religion broadly to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C.2000e(j). As such, Title VII protects more than the observance of Sabbath or practices specifically mandated by an employee's religion. See *Heller v. Ebb Auto Co.*, 8 F.3d 1433, 1438 (9th Cir.1993); *Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir.1978); *McDaniel v. Essex*, 571 F.2d 338 (6th Cir.1978); *Cooper v. General Dynamics*, 533 F.2d 163, 168 (5th Cir.1976). Therefore, attendance at a variety of congregational activities other than worship services has been held to constitute a religious practice protected by Title VII. *See Jones v. New York City Department of Correction*, 2001 WL 262844 at *7 (S.D.N.Y. March 12, 2001) (attendance at religious convocation); *Heller*, 8 F.3d at 1438 (attendance at wife's conversion ceremony); *Redmond*, 574 F.2d at 899-902 (participation in regularly scheduled Bible study class); *Weitkenaut v. Goodyear Tire & Rubber Co.*, 381 F.Supp. 1284, 1288-89 (D. Vt.1974) (attendance at monthly church organizational meetings).

Importantly, the Court should always resist making any determination as to whether or not a particular practice is or is not required by the tenets of the employee's religion. In Title VII cases concerning religious discrimination, it is only appropriate for a court to engage in an analysis of the *sincerity* of a plaintiff's religious beliefs, and not the veracity of those beliefs. *Philbrook*, 757 F.2d at 482. Therefore, the plaintiff's church commitments could only be considered outside the scope of Title VII if they were found to be personal preferences that are "wrapped in religious garb." *Hussein v. Pierre Hotel*, 2001 WL 406258 at *3 (S.D.N.Y. April 20, 2001) (rejecting plaintiff's request to wear a beard for religious purposes as not a sincerely held religious belief); *see also Hussein v. Hotel Employees and Restaurant Union*, 2002 WL 10441 at *4 (S.D.N.Y. Jan.3, 2002) (rejecting employee's request to attend prayer service at his mosque in Jersey City rather than at one closer to

his place of employment); *Tiano v. Dillard Dep't Stores*, 139 F.3d 679, 682 (9th Cir.1998) (rejecting employee's request for specific dates off to make religious pilgrimage).

The plaintiff has not explained how her pastoral duties constitute some sort of demand of religious belief or practice. At the same time, it would be insulting, on the undisputed facts of this case, to imply that they were simply secular acts "wrapped" in the trappings of religion. But, even still, her pastoral activities do sound in voluntary occupational choice as opposed to required religious practice. The Court does not mean to feign ignorance that such things – pastoring or teaching – are, in fact, directly and regularly related to religious belief and practice. But, numerous individuals practice faith, of various denomination and creed, without accepting the sort of occupational duties which are now alleged to be in conflict with the plaintiff's work responsibilities with the defendant. To be hyperbolic, it seems unlikely that the Court would sustain an accommodation challenge where the plaintiff had simply taken a full-time job with a church, more perfectly and fully in conflict with her work responsibilities than present here. One would tend to refer to that as a job change rather than a religious conflict. The plaintiff has not made any evidentiary showing or argument that her decision to perform pastoral duties was some sort of religious obligation or mandate as opposed to mere personal preference or choice in how she participates at her church. The Court is not unfamiliar with notions of "calling" but that has not been averred. The problem is not that pastoral care is unlikely an incident of sincerely held religious belief but that the plaintiff herself has not attempted to create issues of fact as to her beliefs, specifically. And, the fact that she is not paid does not seem to change the calculation. She is still formally in a vocational staff position at her church.

In fairness to the plaintiff, however, this is not any sort of point assailed by the defendant,[4] probably for the reasons mentioned, both as to the status of the law and the

---

[4] Although, the defendant makes a brief remark in this regard. (Mem. Supp. Mot. Summ. J. at 16.)

factual particulars of this case. So the religious belief element of her *prima facie* case has not been implicated in a way that directly invited sworn statements of the plaintiff on this issue. In her Complaint, the plaintiff did aver that she "performed the duties of Assistant Pastor/Youth Pastor because of her good faith, spiritual beliefs in the teachings of the Pentecostal church, and to otherwise fulfill her spiritual needs." (Compl. ¶ 16.) That statement, of course, is not admissible evidence upon which summary judgment could be averted. But, it is an indication that she would so swear were it put to her more directly than the present motion for summary judgment has. The Court would not make any recommendation as to summary judgment based on this issue.

### *2.    Adverse Employment Action*

The only challenge the defendant has made regarding the plaintiff's *prima facie* showing is that there was no adverse employment action taken against her, insofar as she voluntarily quit her job for a higher paying one. The plaintiff argues that she was constructively forced to look for new work, a type of legally cognizable discharge.

In the Fourth Circuit, an employee is constructively discharged "if an employer deliberately makes the working conditions of the employee intolerable in an effort to induce the employee to quit." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir.1995)); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). A plaintiff must therefore "allege and prove two elements: (1) deliberateness of the employer's actions and (2) intolerability of the working conditions." *Whitten*, 601 F.3d at 248. To prove deliberateness, the plaintiff must prove "that the actions complained of were intended by the employer as an effort to force the employee to quit." *Id.*; *Bristow v. Daily Press, Inc.* 770 F.2d 1251, 1255 (4th Cir. 1985). "To act deliberately, of course, requires intent." *Id.* (quoting *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984).) The Fourth Circuit requires proof of the

employer's specific intent to force an employee to leave.[5]  *Bristow*, 770 F.2d at 1255.  Intent may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions.  *Id.*  Where, however, all employees are treated identically, no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign.  *Id.*  Johnson, 646 F.2d at 1256.

As to the second element of constructive discharge, the intolerability of working conditions is assessed by the objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign.  *Bristow*, 770 F.2d at 1255.  "An

---

[5]  The applicability of this high standard persists in this Circuit even till now.  *See Whitten*, 601 F.3d at 248-49 & n.8.  In *Whitten*, the Fourth Circuit affirmed the test, even while recognizing that it might be on less than solid footing in light of recent United States Supreme Court precedent:

> Our requirement that the plaintiff prove the employer intended to force the plaintiff to quit is arguably in some tension with the Supreme Court's decision in *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). In *Suders*, the Court described constructive discharge as "a 'worse case' harassment scenario, harassment ratcheted up to the breaking point," *id.* at 147-48, 124 S. Ct. 2342, and held that a constructive-discharge plaintiff must prove that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign," *id.* at 147, 124 S. Ct. 2342. Because there is no requirement that a plaintiff in a routine hostile-environment case show that the employer intended to force her to quit, it could be that, under *Suders*, deliberateness on the part of the employer would not be required to show the "'worse case' harassment scenario" that is constructive discharge. We have, however, continued to apply the deliberateness requirement to constructive-discharge claims since Suders was decided. *See Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir.2006) (involving constructive-discharge claim asserted under the Americans With Disabilities Act). We believe that circuit precedent thus prevents us from considering Whitten's assertion that deliberateness is no longer an element of a constructive discharge claim. *See, e.g., Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 n.2 (4th Cir.2002) ("[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that." (internal quotation marks omitted)).

employee may not be unreasonably sensitive to his working environment." *Id*. (quotation and citation omitted). Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. *Id*. "Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." *Id.*

The plaintiff has created issues of fact as to both elements. Concerning the first, the plaintiff has put forward some evidence that the defendant acted deliberately such that its actions "were intended . . . as an effort to force the employee to quit." *Whitten*, 601 F.3d at 248; *Bristow*, 770 F.2d at 1255. The plaintiff has testified that David Riggs, the School Director, told her it was mandatory that she work the night shift on Tuesdays and Thursdays. (Pl. Dep. at 46, 49, 50, 62.) The plaintiff has further testified that Riggs told the plaintiff that he knew plaintiff did not want to be at Centura; that he would make it his task that the plaintiff would no longer be at Centura; that he was taking her General Education coordinator duties away; and that he was considering taking the plaintiff's Legal coordinator duties from her. (Pl. Dep. at 67-68 & Ex. 1 thereto). The plaintiff has also testified that, in May of 2008, Varner called the plaintiff at least twice and advised her to seek employment elsewhere because things were not going to change at Centura as far as the plaintiff's evening schedule was concerned. (Pl. Dep. at 144.)

The plaintiff has also produced some evidence that the defendant did not uniformly enforce the nighttime teaching obligations, which were imposed on her. Intent may be inferred through circumstantial evidence and, as stated, where all employees are *not* treated identically, a particular employee may claim that difficult working conditions signify the employer's intent to force that individual to resign. *See Bristow*, 770 F.2d at 1255. To that end, the plaintiff has offered evidence that Natasha Bratton, the Medical Assistant coordinator, advised Riggs she could not work at night because she had small children at

10

home.[6] (Riggs Dep. at 76-78, 90-91.) Riggs rearranged Bratton's duties so that she taught in the morning and then went on the road to visit students doing externships in the field in the afternoon. *Id.* She was not required to teach or otherwise work in the evenings. *Id.* The plaintiff has also sworn that a Karen Johnson, the externship coordinator, was a Pastor and taught Bible studies on Wednesday nights. (Pl. Aff. ¶ 28.) Johnson also asked Riggs for an accommodation, and Riggs granted it. *Id.* Specifically, Riggs allowed Johnson to have Wednesday nights off. *Id.* He called in an instructor named Simone Jones to teach the two or three hours of classes that Karen Johnson taught on Wednesday night. *Id.* The apparent disparity in treatment is sufficient to create an issue of fact as to the deliberateness element of a constructive discharge. *See Bristow*, 770 F.2d at 1255.

Concerning the objective intolerability of the working conditions, the plaintiff has likely also created issues of fact as to this element as well although the call seems close. The Court is not sure whether or not a "'reasonable person' in the employee's position would have felt compelled to resign" her full-time, paying work for non-paying, elective work at their church. *See Bristow*, 770 F.2d at 1255. But, "[a]n employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, ***in excess of those faced by his co-workers***." *Id.* (emphasis added). It seems that the disparate treatment of other employees would likely have enhanced a reasonable person's perception that the failure to accommodate was a personal attack designed to force them out. This would appear particularly true where, here, the plaintiff alleges that she was told directly that Riggs intended to force her out and eliminate many of her duties. (Pl. Dep. at 67-68 & Ex. 1 thereto.) This is a serious charge and would appear, if true, to produce conditions of unreasonable harshness.

---

[6] The fact that the defendant has an explanation for the difference in treatment (Riggs Dep. at 76-78, 90-91.) is of no moment. A reasonable jury would be permitted to disbelieve that explanation.

The defendant argues in such a way as to imply that psychological intolerability in the working conditions is somehow necessary. (Mem. Supp. Mot. Summ. J. at 22.) The Court is not sure that such a requirement exists; the defendant has not directed the undersigned's attention to it. The test is whether a "'reasonable person' in the employee's position would have felt **compelled** to resign." *See Bristow*, 770 F.2d at 1255 (emphasis added). That is exactly what occurred. The plaintiff has alleged, and the defendant does not seem to contest, that the evening teaching requirement created a perfectly immovable impasse of conflict (nigh of one side conceding entirely the obligation imposed on its side). And, in that respect, the work demand was, in a manner of speaking, intolerable, absolutely. She was forced to make a zero-sum choice – work or church. Her work demand could not in any sense be tolerated harmoniously with what the plaintiff ostensibly believes was her religious obligation. Whether she broke down emotionally or felt "comfortable" talking with Riggs about that conflict does not seem in any respect to make this full and direct conflict any more "tolerable." The circumstances of her life literally could not tolerate it. The defendant goes so far as to imply that her claim of constructive discharge does some disservice or offense to circumstances where people suffer real "work-related stress." Respectfully, the Court would recommend better sensitivity to, by what all accounts was, a genuine and personal conflict, whether or not the defendant believes the plaintiff was sufficiently demonstrative in her emotional angst about it.

The Court would recommend that the plaintiff has created issues of fact concerning whether or not she was constructively discharged and, by extension, each element of her *prima facie* case.

    **B.    Undue Hardship**

Once a *prima facie* case is established, the employer must demonstrate either (1) that it provided the plaintiff with a reasonable, though not necessarily a total, accommodation for his or her religious observances or (2) that such accommodation was not provided because it would have caused undue hardship. *See E.E.O.C. v. Firestone*

*Fibers & Textiles Co.*, 515 F.3d 307, 315 (4th Cir.2008). The defendant takes the latter tack that the plaintiff's requested accommodation would have imposed an undue hardship such that the defendant was not required to make it.

In accord with the corporate policy previously detailed, the defendant requires its Coordinators, like the plaintiff, to work when the student population drops below a certain threshold. (Pl. Dep. at 42; Def. Ex. 3.) This requirement was necessary to control costs and considered very important by the defendant. (Riggs Dep. at 17-18.) A drop in student population during the plaintiff's employment, implicated this policy and forced her to work evenings.[7] (Pl. Dep at 17-18, 25.)

As discussed, the plaintiff advised both Katrina Varner and Riggs that the evening teaching requirement posed a conflict with her Tuesday and Thursday pastoring obligations. (Riggs Dep. at 83-84; Carter Dep. at 32, 58-61.) The plaintiff first met with Riggs to request an accommodation to this requirement on March 4, 2008. (Carter Dep. 61.) That request was rejected. (Riggs Dep. at 84-85, 87.)

In defense of the corporate policy, the defendant contends that Coordinators had to teach at night because they were the strongest employees and thus most likely to increase the effectiveness and retention rate of the night program. (Riggs Dep. at 94.) The defendant, therefore, could not hire a new night teacher without losing further revenue; could not substitute another teacher without losing the advantage of having a Coordinator on the night shift; and felt obliged to comply with corporate policy of having Coordinators teach when student numbers were low. (Varner Dep. at 38, 45; Thompson Dep. at 44.)

---

[7] The Court would note that it does not appear that there is any evidence in the record of the precise volume of students at the school, during the relevant period. The defendant has certainly put forward evidence that the school was not profitable. (Riggs Dep. at 17-18.) But, the Court cannot find any evidence that the student population dipped to a level which mandatorily implicated the policy. The defendant emphasizes the policy and the need to improve retention but then sort of allows the conclusion to be drawn that student numbers had actually dipped below the necessary threshold. The Court may have just missed this evidence, however.

The plaintiff has attempted to put forward some evidence that, at absolute worst, others could have covered for her at a cost to the defendant of only $40-$60 a week to hire a Legal instructor to cover the plaintiff's shifts. (Varner Dep. at 91-92.) The plaintiff has also sworn that others, already on campus during relevant hours, could have covered for her. (Pl. Aff. ¶¶ 19-24.)

The Court, however, is principally compelled by the fact that two other individuals, with comparable conflicts were, in fact, accommodated. The defendant pushes back in regards to Karen Johnson's accommodation, contending that the actual accommodation stripped her of her Coordinator duties such that the evening requirement was no longer applicable. Of course, that begs the question as to why some similar and creative attempt was not offered the plaintiff. And, any justification offered to treat Johnson dissimilarly from the plaintiff says nothing about the accommodation of Bratton, also a Coordinator. The presence of these accommodations, even if ultimately capable of differentiation from the plaintiff's circumstances, inject too many factual considerations to resolve on motion. A jury must weigh the relative justifications. It is enough that other accommodations existed, close enough in circumstance, for the Court to conclude that issues of fact exist as to whether any accommodation of the plaintiff's needs truly imposed an undue hardship.

The claim should survive summary judgment.

**CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment [Doc. 26] be GRANTED in part and DENIED in part. Specifically, the motion should be GRANTED as to the plaintiff's claim for retaliation and DENIED as to her claim for religious discrimination.

IT IS SO RECOMMENDED.

>                          s/Bruce H. Hendricks
>                          United States Magistrate Judge

June 16, 2011
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).