IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

LOUVENIA CARTER, )
) Civil Action No. 2:10-00907-CWH
Plaintiff, )
)
vs. ) **ORDER**
)
CENTURA COLLEGE, )
)
Defendant. )
_____ )

This matter is before the Court on the report and recommendations (R&R) (ECF No. 51)

of United States Magistrate Judge Bruce Howe Hendricks recommending that the defendant's

motion for summary judgment (ECF No. 26) be granted as to the plaintiff's claim for retaliation

and be denied as to the plaintiff's claim for religious discrimination. The Court adopts the

magistrate judge's recommendation with regard to the retaliation claim; however, the Court

declines to follow the magistrate judge's recommendation with regard to the religious

discrimination claim, and accordingly grants the defendant's motion for summary judgment in

full.

## I.    BACKGROUND

### A.    PROCEDURAL HISTORY

The plaintiff, Louvenia Carter ("Carter"), filed this action against her former employer,

the defendant, Centura College ("Centura" or "the school"), on April 13, 2010. The plaintiff's

complaint advanced two causes of action: (1) a claim for religious discrimination, failure to

accommodate, and constructive discharge in violation of Title VII; and (2) a claim for retaliation

in violation of Title VII. Centura filed an answer on May 10, 2010. Pretrial matters were

referred to United States Magistrate Judge Robert S. Carr, pursuant to United States Code Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C. Following discovery, the defendant moved for summary judgment on December 21, 2010. The plaintiff responded on January 21, 2011, and the defendant replied on January 31, 2011. On February 7, 2011, the case was reassigned to Magistrate Judge Hendricks due to the retirement of Magistrate Judge Carr. On June 16, 2011, Magistrate Judge Hendricks issued an R&R, to which the defendant objected on June 30, 2011.

### B.    FACTS

The plaintiff appears to have a broad range of interests and work experience. She graduated from South Carolina State University with a Bachelor of Science Degree in Criminal Justice and worked for the Charleston County Sheriff's Office. She then earned a paralegal's certificate from Trident Technical College and was thereafter employed by several law firms in the Charleston area. (Dep. of Louvenia Carter, 8:5-7, 12:1–17:21). She is also an ordained minister in the Pentecostal church,[1] and, beginning in 2000, served as an assistant pastor and youth pastor for churches started by her parents in North Charleston and Greeleyville.[2] (Compl. ¶¶ 11-12, ECF No. 1). The plaintiff led services at the church in North Charleston on Tuesday and Thursday evenings and ministered at the church in Greeleyville on Friday nights and Sundays. (Carter Dep. 114:1-21, Aff. of Louvenia Carter ¶ 3, ECF No. 31-6 ). She did not receive any compensation for her service at these two churches. (Carter Dep. 114:21-25).

---

[1] Though the complaint states that the plaintiff is an ordained Pentecostal minister, the plaintiff describes her religious affiliation as "Apostolic." (Carter Dep. 57:22-58:16).

[2] The plaintiff's parents serve as the senior religious leaders of the Open Door Apostolic Church Number One of Jesus Christ, which is located in North Charleston, and the Open Door Apostolic Church Number Two of Jesus Christ, which is located in Greeleyville. (Carter Dep. 56:18-57:21,114:1-115:4).



Centura is an adult education college with locations in South Carolina, Virginia, and Florida, including a campus in North Charleston.[3]  The Charleston Campus offered the following programs: legal assistant, computer and business skills, networking and technology, and medical assistant. (Dep. of David Riggs 116:18–118:12).  Centura College offers classes in five-week modules, with classes typically offered in the mornings and at night.  (Carter Dep. 25:20–26:5). The school offered night classes, at least in part, to accommodate the schedules of adult students who worked jobs during the day.  (Id. 25:3-11).

In March of 2005, Centura hired the plaintiff as a part-time seminar specialist to give presentations to students and instructors on topics such as workplace etiquette and classroom management.  (Carter Dep. 19:3–20:24).  On May 31, 2005, Centura hired the plaintiff as a full-time instructor, whose duties included teaching classes, providing syllabi, and maintaining grades.  (Id. 22:4-24, 27:6-14).  At the time, full-time day instructors taught classes from 8:00 a.m. to 12:00 p.m., took a lunch break, and then had a planning period from 2:00 p.m. to 5:00 p.m.  (Id. 23:2-4).  Because of budget pressure, Centura abolished the planning period and began to require some instructors to work a "split shift."  An instructor working a split shift would teach classes from 8:00 a.m. to 12:00 p.m., take the afternoon off, and then teach from 6:00 p.m. until 10:00 p.m.  (Id. 23:22–25:6).

Soon after hiring her, Centura promoted Carter to serve as the coordinator of its legal assistant program.  (Id. 22:1-24).  In this position, the plaintiff's duties included overseeing the department, hiring, firing, training, and providing feedback for instructors, assisting in admissions, and ensuring the continued accreditation of the college.  (Id. 27:15–29:8).  At some

---

[3] During at least of part of the relevant period, the school was known as "Beta Tech."



point, the plaintiff was also given responsibilities as the coordinator of the "general education" program.[4]

As the coordinator for the legal assistant program, the plaintiff worked from 8:00 a.m. to 5:00 p.m., five days a week, except on Wednesday which was her "late day," when she worked from 10:00 a.m. until 7:00 p.m. Each coordinator was required to work a late night once a week. (Carter Dep. 23:7-9, 31:2-21). Additionally, as a coordinator, the plaintiff was responsible for covering evening classes if an instructor in her program was unable to be there. However, the school also had an extra instructor, known as the "lead instructor" or "floater," who was present at the school at night and could fill in if an instructor was absent.[5] This "floater" was the "first option" to fill in if a legal instructor was absent in the evening, and the plaintiff was the "second option." Other legal instructors who were at the school but on their planning period could also be asked to cover a class, so the plaintiff rarely had to fill in at night prior to February of 2008. (Id. 33:1–34:11). The only other occasion on which the plaintiff would be required to teach at night was if she was training a new instructor, which she would do between 6:00 and 6:50 p.m. (Id. 23:10-21).

When the plaintiff began working at Centura College, Katrina Varner was the director of the Charleston campus and the plaintiff's immediate supervisor. Varner reported to the Regional Director, Zoe Thompson, who lived and worked in Virginia and was responsible for overseeing six Centura College campuses in Virginia, South Carolina, and Florida. (Deposition of Zoe Thompson 11:23-24, 14:12-22, 35:17-19). In late 2007, Varner voluntarily resigned her position as the director of the Charleston campus. She testified that, at the time, the campus "was in

---

[4] It is not entirely clear whether the "general education" program was another name for the "computer and business skills" program, or whether it was a separate and independent program.

[5] The floater/lead instructor was for the whole school, not just for the legal department. (Carter Dep. 40:11-21).



trouble as far as losing students and things like that." (Dep. of Katrina Varner 19:17-19).

Thompson had repeatedly warned Varner about "[t]he profitability of the school and lack of,

organization of the school and lack of, and growth of the school and lack of." (Thompson Dep.

22:19–23:6).

In December of 2007, Thompson hired David Riggs to lead the Charleston campus and

told him that "[t]he school needed to grow" and "needed to be profitable." (Id. 23:24–24:8).

Riggs recalled that at the time he was hired, he was advised that the Charleston campus was

"very much non-profitable." His task was to

> take the school from being non-profitable, make it profitable, take a look at why
> the school was not doing well, correct the things that needed [to be] corrected,
> make sure that [the school was] delivering on the promises that were made to the
> students during enrollment process, [and to] make sure that [the school was]
> following policy, procedures, [and] accreditation standards.

(Riggs Dep. 17:12–18:12). Although Varner had resigned her position as director of the

Charleston campus, she remained at the school as the director of education. All of the

department heads and coordinators, including the plaintiff, continued to report to Varner, Varner

reported to Riggs, and Riggs reported to Thompson. (Riggs Dep. 19:6-12, 20:3-19).

Centura College had a policy that required program coordinators to teach when the

number of students in their program dropped below a particular level. The written policy

provided:

> All coordinators will be required to teach minimum classes if their student counts
> at the beginning of a module drop below 100 students.
>
> - Less than 50 students - Teach 4 classes per week.
> - 50 to 100 students - Teach 2 classes per week
> - Over 100 students - first line of substitution

(Memo from Gerald Yagen, President, to All School Directors, Rev. January 30, 2004, ECF No.

26-3, Ex. 3). Thompson testified that if coordinators were following this policy, they should



have been working split shifts. (Thompson Dep. 43:2-7). According to the plaintiff, between 2005, when she became the coordinator of the legal assistant program, and the beginning of 2008, the number of students in the legal assistant program never exceeded 50, yet she was never required to teach four classes or to work at night. (Carter Aff. ¶¶ 15-16).

In January of 2008, Thompson had a conversation with Riggs about managing the budget at the Charleston campus. Salaries and payrolls represented one of the school's largest expenses, and Thompson and Riggs discussed having coordinators teach split shifts. (Thompson Dep. 44:1-23). Many of the school's instructors were "month-to-month employees," and if coordinators began to teach classes, the school could hire fewer instructors. (Riggs Dep. 74:10-21). Furthermore, evening classes were decreasing in size, and Riggs was concerned that students in the evening program did not know their program coordinators and the program coordinators did not know the evening students. According to Riggs, coordinators were supposed to be the programs' strongest instructors, and he hoped that by requiring coordinators to teach evening classes the school would "increase the retention rate" and "reduce absenteeism." (Id. 73:19–74:3, see also Varner Dep. 38:1-6).

During the first module of 2008, which spanned January and February, the plaintiff was not required to work at night. She worked her normal schedule and was not assigned to teach any classes. (Carter Aff. ¶ 5). The plaintiff also continued to lead services at her church in North Charleston on Tuesday and Thursday evenings. The services started at 7:30 p.m. and lasted until around 9:00 or 9:30 p.m. To arrive timely at these services, the plaintiff needed to leave her job at Centura by between 7:00 and 7:15 p.m. (Id. ¶ 3). At the end of February, the plaintiff began covering a class for one of the legal instructors, Charmaine Palmer-Roberts, who was continuously out sick. The plaintiff covered for Palmer-Roberts from Monday, February 25,



2008, to Friday,[6] February 29, 2008, and the class lasted until 7:50 p.m. Covering this class interfered with the plaintiff's religious services, but she did not protest because she believed the situation was temporary. (Id. ¶ 6, Carter Dep. 32:4-15).

Sometime between February and March, Varner came into the coordinators' office and told them that Riggs was requesting that they work at night. According to the plaintiff, Varner said, "I know it's going to be a problem for some of you, so you need to go talk to Mr. Riggs yourself and let him know what your situation is." (Carter Dep. 47:2-24). At the time, the plaintiff was already working nights substituting for Palmer-Roberts. (Id. 49:7-17). On the day Varner made this announcement, the plaintiff went to Riggs, advised him that she had an obligation to pastor religious services, and requested she be allowed to take off all Tuesday and Thursday nights. (Id. 55:15–56:14, 96:20-25). Riggs told the plaintiff that he would consider her request and get back to her. (Id. 60:16-20).

When Riggs failed to get back to the plaintiff, she approached him a second time. Riggs told the plaintiff that he was not able to accommodate her request because he wanted it to be mandatory that all coordinators work nights. (Id. 61:25–62:12). According to the plaintiff, she told Riggs that it was

> very imperative for me to have those days off, because at that point, we were starting a new church, and so my responsibilities and duties were changing, and I was up to go to a higher calling. And he said, well, I understand that. He says, it's not always going to be this way,[7] but we will just try to work at it, and he just kind of blew me off.

(Id. 63:4-11).

---

[6] The record suggests that the school only offered evening classes Monday through Thursday.

[7] Consistent with this claim, Riggs testified that the night-time teaching requirement for coordinators at the school was intended to be a temporary situation. He claims that he told the plaintiff that "we were going to need to do this for the short term, for the betterment of the school, betterment of the job." (Riggs Dep. 84:16-86:24, 87:3-21).



On March 18, 2008, Riggs sent an email to the plaintiff requesting that she attend a

meeting with him at 4:00 p.m. that afternoon to discuss several job-related issues. (See ECF No.

31, Ex. 2). These issues included: the plaintiff's alleged failure to cover a number of legal

classes scheduled at night; the plaintiff's decision to transfer the only student in one of her

evening classes to a more advanced class; the plaintiff's decision to transfer another student out

of one of her classes and into an independent study; and the plaintiff's "heavy-handed" treatment

of students and instructors. In her deposition testimony, the plaintiff recounted her meeting with

Riggs as follows:

> He called me in for a meeting. And he just started talking about how he knew I
> didn't want to be there, it was obvious, the consensus, I didn't want to be there,
> and he was going to make it his task that I wasn't going to be there, and he was
> going to take away all my duties, general education duties. And he told me we
> were going to have a future meeting about taking away – discussing my legal
> program, my duties in the legal program. And then Zoe [Thompson] called and
> interrupted the meeting and he told me he would get back with me. So that was
> the extent of our meeting, which had no conclusion.

(Id. 67:19–68:5).

Unbeknownst to Riggs, the plaintiff carried a tape recorder into the meeting and recorded

their conversation. The plaintiff prepared a transcript of the conversation, which the defendant

submitted to the Court (ECF No. 33-1). (See Carter Dep. 68:23–70:25). The Court has reviewed

the plaintiff's transcript and does not find Riggs' alleged statement that he would "make it his

task" that the plaintiff "wasn't going to be there" anywhere in the transcript. The transcript does

reflect that Riggs relieved the plaintiff of her responsibilities as the coordinator for the general

education program, but the plaintiff claimed in her deposition that he did so because she

reprimanded one of his friends. (Id. 80:12-16, 81:4-7). Additionally, Riggs made it clear at this

meeting that he expected the plaintiff to cover Palmer-Roberts' classes and that she was not to

schedule substitutes to cover these classes. (Id. 50:1-2). Palmer-Roberts was still an employee



at the time, and the school was checking with her on a daily basis to see if she was well enough to teach.

On March 19, 2008, the plaintiff sent an email to Thompson expressing distress, anxiety, and fear following her meeting with Riggs the day before. (See ECF No. 31-3). Thompson responded later that day, indicating that she was surprised to hear of the plaintiff's allegations, but was taking her concerns very seriously and intended to immediately begin an investigation. (See id.). The plaintiff's email to Thompson did not mention her request for religious accommodation or her belief that Riggs was attacking her for asking to miss work for church. (See id.; Carter Dep. 109:5-20). Additionally, when Thompson visited the Charleston campus in April of 2008, the plaintiff again failed to raise her concerns about the school's refusal to accommodate her religious practices. (Carter Dep. 111:6–113:6).

The second module of 2008 began on March 3 and ran through April 7. During this module, the plaintiff was assigned to teach four classes in the morning and one class in the evening between 7:00 p.m. and 7:50 p.m. The plaintiff's evening class had only one student. The plaintiff also covered a class for Palmer-Roberts from 8:00 p.m. to 9:50 p.m. from March 18 through March 27, 2008. Even if the plaintiff had not been required to cover for Palmer-Roberts, the class she was required to teach from 7:00 p.m. to 7:50 p.m. would have prevented her from attending her religious services. (Carter Aff. ¶¶ 9-11). The third module of 2008 began on April 7 and ran through May 12. The plaintiff was scheduled to teach three or four classes in the morning and one class in the evening. She also covered evening classes for Palmer-Roberts from April 7 through April 24. (Id. ¶ 12).

On May 15, 2008, the plaintiff sent an email to Riggs requesting emergency leave. (ECF No. 26-3, Ex. 11 at 3-4). The plaintiff indicated that her work schedule was causing her "great



distress" and said that she was "beginning to have symptoms of migraines and feeling faint."
(Id.). She requested that her vacation time and sick time be used to cover her leave. Riggs
replied the next day, approving the request and indicating that the plaintiff's vacation and sick
time would permit her to take off through May 27. (Id. at 3). The plaintiff claims that while she
was out on leave, Varner called her and told her that she should seek employment elsewhere
because the night work requirement was not going to change. The plaintiff indicated that Varner
had previously made a similar remark to all of the coordinators in person. (Carter Dep. 144:14-
24).

   While the plaintiff was on leave, the Charleston campus decided to discontinue its legal
assistant program because the program was not in demand and was not "carrying itself." (Riggs
Dep. 116:18-19). The school also subsequently eliminated its CAS program (computer skills)
and its NT program (computer networking) and replaced them with programs in massage therapy
and medical billing and coding. According to Riggs, the new programs were more successful
than the programs they replaced. Thus, of the four specialty programs initially offered by the
school, only the medical assistant program remained. (Riggs Dep. 116:18–118:12). Despite the
elimination of the legal assistant program, Centura College guaranteed the plaintiff a position as
an instructor (Compl. ¶ 42), and the plaintiff has not alleged that this change in her
responsibilities would have resulted in any diminution of her pay.

   Around the first week of May 2008, before she requested a leave of absence, the plaintiff
applied for a job with JK Harris & Co. (Carter Dep. 121:25–123:3). On May 18, 2008, while
she was still on sick leave, the plaintiff filled out an emergency contact form for JK Harris. (Id.
123:7-21.) At this time, the plaintiff already had a job offer from JK Harris, but was still
negotiating her salary. (Id. at 155:15–156:8). The plaintiff did not return to work on Monday,



May 27, and, on May 31, she sent an email to Riggs resigning her position. (Id. 119:8-17). On Monday, June 2, 2008, the plaintiff began working for JK Harris at an annual salary of $36,000, which was higher than the $35,011 annual salary she earned at Centura. (Id. 124:25–125:11). The plaintiff admits that by the time she made the decision to leave Centura, she already had a job lined up with JK Harris, but claims that she would have quit her job at Centura regardless of whether she had found another job. (Id. 153:25–155:13).

The plaintiff claims that while Centura refused to grant her request to be off on Tuesday and Thursday nights, the school accommodated similar requests from two other coordinators, Natasha Bratton and Karen Johnson. At the time Riggs took over at the Charleston campus, Bratton was the coordinator of the medical assistant program and Johnson was the coordinator for medical externships. Bratton advised Riggs that she could not work at night because she had young children at home. (See Riggs Dep. 90:13–91:17). Riggs decided that "the population of the school did not support having a coordinator of the medical assisting program and an externship coordinator," so he eliminated Johnson's externship coordinator position and assigned Bratton to coordinate the medical externships as a part of her duties as the coordinator of the medical assistant program. (Id. 76:11-24). Bratton worked at the school coordinating the medical assistant program in the morning, and then left the campus to manage the medical externships in the afternoon. (Id. 90:14-17). She was not required to teach in the evenings because that "would have amounted to a 16- or 17-hour day." (Id. 78:11-14).

Although the school relieved Johnson of her duties as the externship coordinator, it offered her the opportunity to remain at the school as a full-time instructor with no reduction in her pay. To serve as a full-time instructor, however, she was required to teach classes at night. (Id. 76:14–78:2). In his deposition, Riggs implied that because Johnson was no longer a



coordinator, the policy requiring coordinators to work at night no longer applied to her; Johnson chose to work nights because that was the only way for her to teach a sufficient number of classes to remain a full-time employee. (See id.). Like the plaintiff, Johnson served as a pastor at her church and requested that she not be scheduled to work on Wednesday nights, so that she could lead a Bible study. The school accommodated her request by having another medical instructor cover her class from 6:00 – 7:50 p.m. on Wednesday nights. (Carter Aff. ¶ 28, Varner Dep. 62:2-12).

The plaintiff claims that Centura College could have accommodated her at minimal cost and inconvenience. First, the plaintiff argues that the school could have a hired an instructor to cover her classes on Tuesday and Thursday evenings. In response, Varner testified that "[t]he evening position for an instructor would consist of Monday through Thursday 6:00 to 10:00 p.m." and that the school "would not hire an instructor just to teach two nights a week." (Varner Dep. 91:18-22). Even if the school were willing to hire an instructor to fill in only on Tuesday and Thursday nights between 6 p.m. and 8 p.m., Varner estimated the cost would be between $40 and $60 per week. She also noted that this figure would include only the instructor's wages and would not cover any of the other costs associated with hiring an additional employee. (Id. 91:23–93:24).

Second, the plaintiff contends that other legal instructors who were already being paid to be on campus could have covered her evening classes. For example, the plaintiff claims that an instructor name Sheri White was on campus every night from 6:00 p.m. to 9:50 p.m. and was already being paid by the school to be there. Sometimes she would teach, other times she would plan her classes, and other times she would simply sit in the plaintiff's class. The plaintiff asked White if she could cover her classes, and White said that she could. The plaintiff suggested to

#12
CWH.

Riggs that White cover her classes on Tuesday and Thursday nights, but Riggs dismissed the idea. (Carter Aff. ¶¶ 19-24). The plaintiff submitted White's affidavit (ECF No. 31-9), wherein White averred that she was hired to work as a legal instructor at Centura College in March of 2008, she was at the College Monday through Thursday from 6:00 p.m. until the end of the last class, her teaching schedule rarely overlapped with the plaintiff's, and she could have covered the plaintiff's classes with little or no expense to the school because she was already being paid to be on campus. (White Aff. ¶¶ 3-8). Additionally, White contends that she was qualified to teach the plaintiff's class and did so after the plaintiff left the school. (Id. ¶ 9).

In response, the defendant submitted the affidavit of April Green (ECF No. 33-1), who is the current director of Centura's Charleston campus, and who served as the bursar at the time of the events in question. (Green Aff. ¶¶ 1-3). According to Green, White began working at Centura on April 8, 2008, having just received her bachelor's degree in December of 2007. Before being assigned her own classes, White was required to complete a period of training, which included shadowing the plaintiff. (Id. ¶¶ 6-7). The first module during which White was assigned her own classes began on May 12, 2008, just days before the plaintiff left the school on sick leave. During this module, White taught for four hours each night Monday through Thursday, and thus would not have had time to cover the plaintiff's classes. (Id. ¶¶ 8-9). Finally, Riggs testified that even if other instructors were available to teach on Tuesday and Thursday nights, having them cover the plaintiff's classes would not have served all of the goals of the school's policy requiring coordinators to teach.

> Q. I mean, there were instructors that, if necessary, could have taught those night classes other than the department heads. Right?
>
> A. . . . . I don't know. And if they could have, it wasn't being effective. We were not having good results at night. So even if they were available, [the plaintiff]



would have been the best choice, as the head of the program, to get in there and work with these kids and find out the problems.

(Riggs Dep. 94:14-23).

## II.    DISCUSSION

### A.    STANDARD OF REVIEW ON A REPORT & RECOMMENDATION

The Court is charged with making a de novo determination of any portions of the magistrate judge's recommendation to which a specific objection is made.  28 U.S.C. § 636(b). The Court evaluates the evidence without granting any deference to the magistrate judge's findings and conclusions.  Mathews v. Weber, 423 U.S. 261, 270-71 (1976); Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).  The final decision is made by the Court based upon the actual record, not merely the magistrate judge's reported findings.  Wimmer v. Cook, 774 F.2d 68, 76 (4th Cir. 1985).  The Court may accept, reject, or modify, in whole or in part, the report and recommendation, or recommit the matter with instructions.  28 U.S.C. § 636(b)(1). Moreover, a party's objections must specifically identify the portion of the magistrate judge's reasoning that the party contends is flawed.  See 28 U.S.C. § 636(b)(l)(C) (If a party objects, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982) (suggesting that de novo review is unnecessary where "a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations").

### B.    STANDARD OF REVIEW ON A MOTION FOR SUMMARY JUDGMENT

"Summary judgment is appropriate when a party, who would bear the burden on the issue at trial, does not forecast evidence sufficient to establish an essential element of the case, such



that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Wells v. Liddy, 186 F.3d 505, 520 (4th Cir. 1999) (internal citations and quotation marks omitted). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Id. at 587. Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex, 736 F.2d 946, 960 (4th Cir. 1984).



Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson, 477 U.S. at 247-48). "Together, the genuineness and materiality requirements express the sound proposition that litigation for its own sake is not a judicious use of resources." Hux v. City of Newport News, Va, 451 F.3d 311, 315 (4th Cir. 2006). In the absence of the necessary minimal showing by a plaintiff that a defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Anderson, 477 U.S. at 256-57. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting Celotex, 477 U.S. at 323-24).

### C.    THE MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

The magistrate judge recommended that this Court dismiss the plaintiff's claim for retaliation, noting that the plaintiff appeared to have abandoned this claim. The plaintiff did not object to the R&R, so this Court only reviews this portion of the magistrate judge's recommendation for clear error. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) ("[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the



record in order to accept the recommendation.'") (quoting Fed. R. Civ. P. 72 advisory committee's note). In its motion for summary judgment, the defendant argued that the plaintiff could not state a prima facie case of retaliation based on a hostile work environment because she failed to present any facts to demonstrate severe or pervasive conduct. The plaintiff completely failed to respond to this argument, and thus the Court agrees with the magistrate judge that she abandoned her claim for retaliation. Finding no clear error in the magistrate's recommendation, the Court adopts the R&R with regard to the plaintiff's retaliation claim and dismisses the claim with prejudice.

Before turning to the R&R's analysis of the religious discrimination claim, the Court will briefly review the elements of such a claim. Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's religion." 42 U.S.C. § 20003-2. This provision not only requires that an employer refrain from discriminating on the basis of religion, it also imposes an affirmative duty to reasonably accommodate an employee's religious beliefs and practices. EEOC. v. Ilona of Hungary, Inc., 108 F.3d 1569, 1574 (7th Cir. 1997). The plaintiff in this case alleges that the defendant failed to accommodate her. "To establish a prima facie religious accommodation claim, a plaintiff must establish that: '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985)). "If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious needs without undue hardship." Chalmers, 101 F.3d at1019 (quoting Philbrook, 757 F.2d at 481).



The R&R concluded that the plaintiff had presented a prima facie case of religious discrimination. The magistrate judge found that the plaintiff had presented evidence of a bona fide religious belief that conflicted with an employment requirement and had informed her employer of her belief. The magistrate judge also determined that the plaintiff had raised material issues of fact regarding whether she was disciplined through constructive discharge, and recommended that the plaintiff's case should survive summary judgment as to her prima facie case. Finally, the magistrate judge opined that the defendant was not entitled to summary judgment on the ground that the requested accommodation would create an undue hardship.

### D.    ANALYSIS

The Court agrees with the magistrate judge that the plaintiff has presented evidence sufficient to withstand summary judgment with regard to the first two elements of her prima facie case. However, the Court finds that the plaintiff has not presented evidence that would allow a jury to reasonably conclude that she was disciplined through constructive discharge. Furthermore, the Court finds that the defendant has produced sufficient evidence to show that the requested accommodation would create an undue hardship, and the plaintiff has not presented facts sufficient to rebut this claim. Each of these conclusions will be discussed.

### 1.    Adverse Action

To establish a prima facie case of religious discrimination, the plaintiff must demonstrate that she suffered some adverse employment action as a result of her religious beliefs or practices. In this case, the plaintiff alleges that she was constructively discharged. The National Labor Relations Board (NLRB) originally developed the doctrine of constructive discharge "to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities." Pa. State Police v.



<u>Suders</u>, 542 U.S. 129, 141 (2004). In the Fourth Circuit, "an employee is constructively discharged 'if an employer deliberately makes the working conditions of the employee intolerable in an effort to induce the employee to quit.'" <u>Whitten v. Fred's Inc.</u>, 601 F.3d 231, 248 (4th Cir. 2010) (quoting <u>Martin v. Cavalier Hotel Corp.</u>, 48 F.3d 1343, 1353-54 (4th Cir. 1995)). "The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the <u>simple expedient of quitting</u>." <u>Bristow v. Daily Press, Inc.</u>, 770 F.2d 1251, 1255 (4th Cir. 1985) (emphasis added). "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." <u>Id.</u> The Fourth Circuit Court of Appeals has acknowledged that its

> requirement that the plaintiff prove the employer intended to force the plaintiff to quit is arguably in some tension with the Supreme Court's decision in <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129 (2004) . . . [where] the Court described constructive discharge as "a 'worse case' harassment scenario, harassment ratcheted up to the breaking point," and held that a constructive-discharge plaintiff must prove that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign."

<u>Whitten</u>, 601 F.3d at 248 n.8 (citations omitted) (quoting <u>Suders</u>, 542 U.S. at 147-48). Nevertheless, the Fourth Circuit has "continued to apply the deliberateness requirement to constructive-discharge claims since <u>Suders</u> was decided." <u>Whitten</u>, 601 F.3d at 248 n.8 (citing <u>Heiko v. Colombo Savings Bank, F.S.B.</u>, 434 F.3d 249, 262 (4th Cir. 2006)). Since the Fourth Circuit Court of Appeals has not interpreted <u>Suders</u> to have dispensed with the deliberateness requirement, the plaintiff must satisfy this element.



### a)    *Deliberateness of the Employer's Action*

To establish that an employer acted deliberately, a plaintiff must "prove 'that the actions complained of were intended by the employer as an effort to force the employee to quit.'" Whitten, 601 F. 3d at 248 (quoting Martin, 48 F.3d at 1354). A plaintiff must provide "proof of the employer's specific intent to force an employee to leave." Bristow, 770 F.2d at 1255. "Deliberateness can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment," Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993), or "a failure to act in the face of known intolerable conditions . . . ." Bristow, 770 F.2d at 1255. Failure to accommodate does not create a constructive discharge, per se, although "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." Johnson, 991 F.2d at 132. In Johnson, the Fourth Circuit reversed a district court's holding that the National Institutes of Health ("NIH") constructively discharged an employee by failing to accommodate her disability as required by the Rehabilitation Act. Judge Wilkinson explained:

> In this case, the district court held that NIH had constructively discharged Dr. Johnson because her supervisors were on notice of her need for changes in her working conditions, but failed to affirmatively accommodate her. We think that this standard sweeps too broadly; rather than cabining the doctrine of constructive discharge, the standard adopted by the district court threatens to convert every failure to accommodate under the Rehabilitation Act into a potential claim for constructive discharge.

Id. at 131.

The plaintiff has not set forth facts sufficient to allow a jury to reasonably conclude that Centura deliberately made her work environment intolerable in an effort to force her to quit her job. Riggs testified that he did not know about the plaintiff's religious activities on Tuesday and



Thursday nights when he began requiring the plaintiff to teach night classes, and the plaintiff has not presented any evidence to rebut this claim. If, as the plaintiff claims, Riggs wanted to get rid of her, he would have had the perfect excuse to let her go when he decided to eliminate the legal assistant program for financial reasons. Instead, Centura offered her continued employment as an instructor, and the plaintiff has not alleged that the change in her position would have resulted in any diminution of her pay. Although Riggs sent the plaintiff a harsh email and criticized several aspects of her performance, the plaintiff has not presented any facts indicating that he acted in a hostile or unprofessional manner at any time between March 18, 2008, when he met with the plaintiff regarding her performance, and May 31, 2008, when the plaintiff resigned to take a higher-paying job. The fact that Riggs would not allow the plaintiff to shirk approximately half of her evening teaching responsibilities in order to serve as a part-time pastor is insufficient to allow a jury to reasonably conclude that the defendant was trying to make her working conditions intolerable to compel her to quit.

The R&R concluded that the plaintiff had "created issues of fact" regarding whether the defendant acted deliberately with the intent to force the plaintiff to quit. Specifically, the magistrate judge cited the following five factual allegations: (1) Riggs told the plaintiff that it was mandatory that she work the night shift; (2) Riggs told the plaintiff that he knew she did not want to be at Centura, and that he would make it his task that the plaintiff would no longer be at Centura; (3) Riggs told the plaintiff that he was taking her general education coordinator duties away; (4) Varner advised the plaintiff to seek employment elsewhere because the nighttime teaching requirement was not going to change; and (5) Centura allegedly accommodated other employees, including a coordinator in the medical program. Accepted as true and considered in



the light most favorable to the plaintiff, these facts are not sufficient to allow a jury to reasonably find that the defendant deliberately made the plaintiff's working conditions intolerable.

First, the plaintiff alleges that Riggs told her that it was mandatory that she work the night shift. As the plaintiff acknowledged, Centura offers night classes to accommodate the schedules of students who work jobs during the day. It is undisputed that Centura has a policy requiring coordinators to teach classes if enrollment in their program drops below a given number of students. Among other things, this policy is intended to save the school money by eliminating the need to hire instructors for programs with a small number of students. The plaintiff testified that the number of students in the legal program had never risen to a sufficient level for her not to have been required to teach under the policy. Nevertheless, prior to January of 2008, she had not been required to teach classes at night. In other words, Centura's policy was not actually being enforced until Riggs took over in December of 2007. It should be noted, however, that at least part of the reason that Riggs was brought in to replace Varner as the head of the Charleston campus was because the Charleston campus was struggling financially. Riggs indicated that he did not know about the plaintiff's commitment on Tuesday and Thursday nights when he decided to begin enforcing the policy, and the plaintiff has not presented any evidence to the contrary. It is not surprising that Riggs began enforcing a school policy designed to save money after taking over a campus that was struggling financially, nor is this fact sufficient to show that he was trying to make the plaintiff's working environment intolerable.

Second, the plaintiff alleges that Riggs told her that he knew she did not want to be at Centura, and that he would make it his task that she would no longer be there. According to the plaintiff, Riggs made this comment during a meeting he had with her on March 18, 2008. The Court has reviewed the transcript that the plaintiff prepared using her audio recording of this



meeting and cannot find the statement alleged above. According to the plaintiff's transcript, Riggs indicated that he thought that the plaintiff did not want to be at the school, but he never said that he would make it his job to make sure she was no longer there. Even assuming that Riggs did make the statement alleged, taken in the context of the conversation set forth in the plaintiff's transcript, the statement would not be sufficient to support a finding that Riggs intended to force the plaintiff to quit her job. Although Riggs was critical of the plaintiff regarding a wide range of work-related issues, he concluded the meeting by praising her communication skills and teaching abilities in glowing terms.

Third, the plaintiff claims that Riggs relieved her of certain responsibilities in order to make her working environment intolerable. There is, however, no evidence to demonstrate that the changes in the plaintiff's responsibilities were related to her request for religious accommodation. According to the plaintiff, Riggs took away her duties as the coordinator of the general education program at the meeting on March 18, 2008; however, the plaintiff claimed in her deposition that the reason that Riggs took this position away was because she criticized a co-worker who was one of his friends. The plaintiff has not set forth facts showing that the change in her responsibilities had anything to do with her request for religious accommodation or that it was intended to force her to quit. On a related note, although Riggs removed the plaintiff as the coordinator of the legal program on May 16, 2008, there is no evidence that his decision was in any way related to the plaintiff's request for religious accommodation. Indeed, the plaintiff was removed from her position because Riggs and his superiors viewed the legal services program as unprofitable and decided to eliminate it altogether in favor of programs that they believed would be more popular and profitable. The plaintiff has not presented a shred of evidence to suggest that the defendant's explanations for its decisions to relieve the plaintiff of her responsibilities as



the coordinator of the general education program or to eliminate the legal assistant program were a pretext for religious discrimination.

Fourth, the plaintiff alleges that Varner advised her to seek employment elsewhere because the nighttime teaching requirement was not going to change. The plaintiff was not able to recall exactly when Varner made this statement, but said that it was sometime during her leave of absence, which began on May 15, 2008. The defendant points out that the plaintiff entered into employment negotiations with JK Harris during the first week of May, suggesting that she was looking for another job before the alleged conversation with Varner. Additionally, the plaintiff testified that Varner made a similar remark to all the coordinators in person. Finally, the plaintiff has not alleged that Varner was trying to compel her to quit her job. In fact, the plaintiff stated that she believes that David Riggs was the only individual who engaged in unlawful discrimination against her on the basis of her religion. (Carter Dep. 147:12–22). Varner's alleged statement simply reiterated Centura's position that it would not waive the requirement that the plaintiff teach at night. This is simply not enough to demonstrate that the defendant intentionally forced the plaintiff to quit.

Finally, the plaintiff has alleged that Centura accommodated other employees in comparable positions and claims that this fact establishes that the school was deliberately attempting to force her out. The magistrate judge appears to have relied heavily on this allegation in finding that the plaintiff created a material issue of fact on the question of constructive discharge. The Court agrees with the magistrate judge that evidence of disparate treatment certainly can support a plaintiff's claim that her employer was attempting to force her from her job. In this case, however, the plaintiff's allegations of disparate treatment are insufficient to allow a jury to reasonably reach that conclusion.



As discussed above, the plaintiff alleges that the defendant accommodated the requests of two other coordinators, Bratton and Johnson, who worked in the medical assistant program. In the case of Bratton, the defendant did not simply excuse her from teaching, so that she could have nights off to care for her children. Instead, the school essentially combined what had previously been two coordinator positions—the medical assistant coordinator and the externship coordinator—into a single position. The college assigned Bratton to coordinate the medical assistant program in the morning and supervise student externships in the afternoon. Thus, while Bratton was not required to teach at night, she was required to assume additional responsibilities, managing externships in the afternoon as opposed to teaching classes at night.

Johnson, who had previously served as the coordinator for student externships, lost her position as a coordinator, but was offered the opportunity to remain at the school full-time as an instructor without any diminution of her pay. Johnson was required to teach night classes, however, she was permitted to be absent for two hours on Wednesday nights when she served as a pastor at her church. Since Johnson had lost her position as a coordinator, she was no longer subject to the policy requiring coordinators to cover classes when enrollment dropped and was accordingly no longer in a comparable position to the plaintiff.[8]

As the magistrate judge noted, there are some factual disputes in this case that remain unresolved. This Court, however, finds that these disputes are not material because, considered in the light most favorable to the plaintiff, the facts presented are insufficient to establish that the defendant deliberately drove the plaintiff from her job. The plaintiff was not fired or forced out of her position—she quit to accept a higher-paying job with another employer. Here, as in

---

[8] The plaintiff initially implied that Riggs refused to accommodate Johnson's schedule to allow her to serve as a pastor, suggesting that he was broadly discriminating against employees with religious obligations. After it was revealed that the school accommodated Johnson's schedule to allow her to attend church on Wednesday nights, the plaintiff alleged that this fact demonstrated that Riggs was singling her out for discriminatory treatment. Cf. Compl. ¶¶ 37, 50 with Pl.'s Resp. to Def's Mot. for Summ. J. at 6-7.

<u>Johnson</u>, the plaintiff's evidence "may well demonstrate a lack of flexibility or magnanimity on the part of her supervisors, but what it does not demonstrate is a deliberate intent to force [the plaintiff] from her job." 991 F.2d at 132.

### b)    *Intolerability of the Working Conditions*

"Whether an employment environment is intolerable is determined from the objective perspective of a reasonable person." <u>Heiko</u>, 434 F.3d at 262. "[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge," and "'[a]n employee may not be unreasonably sensitive to his working environment.'" <u>Bristow</u>, 770 F.2d at 1255 (quoting <u>Johnson v. Bunny Bread Co.</u>, 646 F.2d 1250, 1256 (8th Cir. 1981)). Instead, a plaintiff must prove that "a 'reasonable person' in the employee's position would have felt compelled to resign." <u>Bristow</u>, 770 F.2d at 1255. "An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress." <u>Id.</u> "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." <u>Carter v. Ball</u>, 33 F.3d 450, 459 (4th Cir. 1994). "Demotion can constitute a constructive discharge . . . however, '[a] slight decrease in pay coupled with some loss of supervisory responsibilities' is insufficient evidence of constructive discharge . . . ." <u>Id.</u> (quoting <u>Jurgens v. EEOC</u>, 903 F.2d 386, 392 (5th Cir. 1990)).

It is not entirely clear how the "intolerability" analysis should be conducted in a case where a plaintiff alleges constructive discharge through a failure to accommodate a religious practice or belief. On the one hand, the "intolerability" analysis is clearly intended to be objective. <u>Heiko</u>, 434 F.3d at 262; <u>Bristow</u>, 770 F.2d at 1255. On the other hand, courts are not



to weigh the reasonableness of a plaintiff's religious convictions. See Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 144 n.9 (1987); United States v. Ballard, 322 U.S. 78, 86-88 (1944). The allegations in this case—the change in the plaintiff's responsibilities, Riggs' criticism, and Varner's suggestion that the plaintiff consider looking for another job—pale in comparison to evidence of intolerable working conditions that the Fourth Circuit has rejected as insufficient in other cases. See Williams v. Giant Food, Inc., 370 F.3d 423, 434 (4th Cir. 2004) (finding that a plaintiff's allegations "that her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back" were insufficient to establish intolerable working conditions); Carter, 33 F.3d at 459 (holding that "a slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient evidence of constructive discharge . . . .") (quotation marks and citation omitted).

The plaintiff claims that the conflict between her evening teaching responsibilities and her calling to serve as a pastor had become intolerable. Under an objective analysis, the Court would be required to consider whether a reasonable person in the plaintiff's position would have felt compelled to resign in light of the defendant's failure to accommodate her religious obligations. The magistrate judge focused on how the defendant's failure to accommodate affected the plaintiff in this case. The magistrate judge found "that the evening teaching requirement created a perfectly immovable impasse of conflict . . . . [a]nd, in that respect, the work demand was, in a manner of speaking, intolerable, absolutely." The Court is concerned that such an approach converts what should be an objective analysis into a subjective analysis— one that turns not on the reasonableness of the defendant's behavior, but on the intractability of the plaintiff's beliefs. On the other hand, applying an objective approach where a plaintiff



alleges constructive discharge through a failure to accommodate would seemingly require a court to assess the reasonableness of the plaintiff's religious convictions and personal priorities, a task the magistrate judge was understandably hesitant to undertake.

Since the Court has already found that the plaintiff has not presented evidence sufficient to establish deliberateness, it need not and will not decide whether the plaintiff could have proved intolerability. The Court addressed the issue to point out what appears to be a conflict in the law. Although it declines to adopt the magistrate judge's intolerability analysis, the Court certainly does not fault the magistrate judge for adopting the approach she did given the alternative.

### 2.    Undue Hardship

If a plaintiff establishes a <u>prima</u> <u>facie</u> case, the burden shifts to the employer "to show either (1) that it has provided the plaintiff with a reasonable, though not necessarily a total, accommodation or (2) that such reasonable accommodation was not possible without causing undue hardship to the conduct of its business." <u>EEOC v. Firestone Fibers & Textiles Co.</u>, 515 F.3d 307, 315 (4th Cir. 2008). Requiring an employer "to bear more than a de minimis cost" in order to accommodate an employee's religious needs imposes an undue hardship on the employer. <u>Trans World Airlines, Inc. v. Hardison</u>, 432 U.S. 63, 84 (1977). As the Fourth Circuit has observed, "religion does not exist in a vacuum in the workplace," but "coexists . . . with the intensely secular pressures of the marketplace." <u>Firestone Fibers & Textiles Co.</u>, 515 F.3d at 313. "On the one hand, the principal goal of Title VII is to eliminate discrimination in employment. On the other hand, Congress recognized that because of business necessity and the legitimate rights of other employees, it could not impose a duty on the employer to accommodate



at all costs." Id. (citations and quotation marks omitted); see also Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 70 (1986).

Here, the defendant has not alleged that it provided the plaintiff with a reasonable accommodation,[9] but has claimed that the requested accommodation would have created an undue hardship. The defendant has presented evidence that granting the plaintiff's request to have Tuesday and Thursday nights off would have resulted in more than a de minimis cost to the school, and the plaintiff has failed to forecast facts sufficient to rebut this contention.

At its most basic level, the defendant's policy was that when enrollment was low, coordinators would teach classes, so that the college could minimize the number of instructors it needed to hire. The defendant has alleged that employee costs comprised a significant majority of its overhead, and the policy was designed to save the school money. Centura College offered classes between 8:00 a.m. and noon, and again between 6:00 p.m. and 10:00 p.m., Monday through Thursday. Although the plaintiff contends that she requested only a few hours off each week, allowing her to be absent Tuesday and Thursday nights would have effectively reduced her availability to teach evening classes by approximately 50% and have cut her availability to teach classes at any time by approximately 25%.

The classes the plaintiff was teaching were not well attended. The plaintiff has admitted that her largest class had 5 or 6 students, and one of her classes had only a single student. The plaintiff claims that Centura could have hired an instructor to fill in for her on Tuesday and

---

[9] Varner testified that she and other instructors occasionally covered the plaintiff's evening classes on Tuesday and Thursday nights and that the plaintiff often scheduled tests on these evenings, so she would not need to be present. As a result, the school's records indicate that the plaintiff worked past 7:00 p.m. on fewer than half of the Tuesdays and Thursdays in the period between Thursday, March 4, 2008, when she initially requested an accommodation, and May 31, 2008, when she resigned. The records also show that she worked past 8:00 p.m. on only four occasions during this period. The plaintiff claims that the defendant's records are "incomplete," but presents no further details regarding the number of occasions on which she worked late. The defendant does not specifically contend that it accommodated the plaintiff. Nevertheless, a reasonable jury would certainly weigh this evidence in evaluating the plaintiff's claim that she was subjected to "unreasonably harsh conditions, in excess of those faced by [her] co-workers." Bristow, 770 F.2d at 1255.



Thursday nights for between $40 and $60 a week. The defendant disputes this figure, but even if it were correct, it is not a de minimus expense, especially in the context of a program that appears to have been unprofitable. It is not hard to imagine, for example, why a school would balk at paying a full-time coordinator <u>and</u> a substitute instructor to teach a class with one student.

This case would arguably be different if there were any evidence to show that the defendant could have maximized the time the plaintiff spent teaching, without requiring her to work at night. If, for example, the school's legal assistant program offered classes in the afternoon, the plaintiff might have a reasonable argument that the school could have assigned her to teach those classes instead of teaching at night. There are, however, no facts to suggest that such an accommodation could have been made. The plaintiff's proposal was simply for the school to relieve her of 25% of her teaching assignments and pay someone else to cover the classes. This is not the type of accommodation an employer is obligated to make.

Furthermore, the defendant has put forth evidence that the burden of allowing the plaintiff to be absent on Tuesday and Thursday nights involved more than simply the cost of paying a substitute teacher. Riggs testified that part of the rationale behind the evening teaching requirement was a desire to expose students in the evening classes to the school's strongest staff members—its coordinators. The school undoubtedly has an interest in the quality and continuity of the instruction it offers. The parties appear to agree that the plaintiff was hired to be more than simply a teacher. She was hired to be an administrator, a mentor, and a motivator. It seems reasonable that the school would expect to get better instruction from a full-time, salaried coordinator than it would from a part-time instructor paid on an hourly basis. Even if the school could have arranged for a part-time instructor to have taught the plaintiff's evening classes at little or no expense, the plaintiff has not set forth evidence that such an arrangement would have



satisfied the school's goals of increasing retention, reducing absenteeism, and improving the quality of its evening classes.

In rejecting the defendant's undue burden defense, the magistrate judge again relied heavily on the fact that the school did not require Bratton to work at night and allowed Johnson to have Wednesday nights off. As has been noted, however, there is no evidence that the school could have assigned the plaintiff to work with students during the afternoons, as it did with Bratton. Furthermore, Johnson was not in a comparable position because, at the relevant time, she was no longer a coordinator. Notably, the school's arrangement to retain Johnson as a full-time instructor without any diminution in her pay appears to be the same arrangement it was offering the plaintiff at the time she resigned. The fact that the plaintiff has characterized the change in her own responsibilities as a demotion undercuts her contention that Johnson was in a comparable position. If the plaintiff had returned to the school as a full-time instructor and the school had refused to give her a single night off, as it did Johnson, she might have a stronger argument. That is not, however, what happened. The plaintiff used her leave of absence to secure a higher paying position with a different employer, and then quit her job at Centura College. The Court finds that the accommodation sought by the plaintiff would have required her employer to bear more than a de minimis cost, and therefore, it would have created an undue burden. Thus, even if the plaintiff could establish that she was constructively discharged, the defendant would still be entitled to summary judgment.

### III.   CONCLUSION

Not every professional parting warrants a lawsuit. In this case, the plaintiff's religious priorities conflicted with her employer's scheduling requirements. Permitting the plaintiff to be absent two nights a week would have placed an undue burden on a struggling campus that



offered a substantial number of its classes at night, so the school refused to accommodate the plaintiff. The plaintiff has not presented evidence sufficient to establish that the school deliberately drove her from her position. The facts simply suggest that she voluntarily quit her job to accept a higher-paying position with a schedule that better fit her personal priorities.

The Court adopts in part and rejects in part the magistrate judge's R&R. The Court agrees with the magistrate judge that the defendant is entitled to summary judgment on the plaintiff's retaliation claim, and that claim is hereby dismissed. Additionally, the Court finds that the defendant is entitled to summary judgment on the plaintiff's religious discrimination claim and, in this regard, declines to adopt the magistrate judge's R&R. For the reasons set forth in this order, the defendant's motion for summary judgment (ECF No. 26) is **GRANTED** in full. The defendant's motion in limine (ECF No. 40) is **MOOT**.

**AND IT IS SO ORDERED.**

C. WESTON HOUCK
**UNITED STATES DISTRICT JUDGE**

February **24**, 2012
Charleston, South Carolina

